1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

THE HON. RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| MANKE TUG & BARGE CO., INC.; and AMERICAN HOME ASSURANCE COMPANY, <br><br> Plaintiffs, <br><br> v. <br><br> SCHNITZER STEEL INDUSTRIES, INC.; and GENERAL METALS OF TACOMA, INC. d/b/a SCHNITZER STEEL, <br><br> Defendants. | IN ADMIRALTY <br><br> NO. C07-5494 RBL <br><br> FINDINGS OF FACT AND CONCLUSIONS OF LAW <br><br> [PROPOSED BY PLAINTIFFS] |

This matter came on for trial on November 24, 2008, before the Court, sitting without a jury. Plaintiffs are represented by Matthew Crane and Mark Krisher of Bauer, Moynihan & Johnson LLP. Defendants are represented by Christopher Nicoll and Larry Altenbrun of Nicoll Black & Feig PLLC. At the conclusion of trial the Court took the matter under advisement. The Court has considered the testimony presented at trial, the exhibits admitted into evidence, and the arguments of counsel, and the Court being fully advised, now makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1.        This case involves the capsizing of the barge SEA SPRAY on March 22, 2007. Findings of Fact 2-8 below were admitted by the parties and are therefore adopted by the Court as facts.

[PROPOSED] FINDINGS OF FACT AND
CONCLUSIONS OF LAW - 1
NO. C07-5494 RBL

ATTORNEYS AT LAW
BAUER MOYNIHAN & JOHNSON LLP
2101 FOURTH AVENUE - SUITE 2400
SEATTLE, WASHINGTON 98121-2320
(206) 443-3400

2.    At the time of capsize, the barge SEA SPRAY was owned by plaintiff Manke Tug & Barge Co., Inc.

3.    The SEA SPRAY is a steel deck barge, approximately 250 feet long, 50 feet wide, and 18 feet 6 inches deep.

4.    At the time of capsize, the SEA SPRAY was verbally chartered by General Metals of Tacoma, Inc., d/b/a Schnitzer Steel to transport shredded steel at the rental rate of $750/day.

5.    The barge capsized at the dock owned and operated by General Metals.

6.    When the SEA SPRAY capsized, it was loaded with shredded steel owned by Schnitzer Steel Industries, Inc.

7.    Plaintiffs incurred barge salvage, repair and surveyor costs resulting from the capsize totaling $267,903.14.

8.    Defendants incurred steel recovery, reprocessing, marine surveying, towing, cleanup and demurrage/dispatch costs resulting from the capsize in the amount of $382,880.16, based on 4,019 tons being loaded on the barge.

9.    Manke Tug's sole shareholder is Joe Manke.  Manke Tug and its hull insurer, plaintiff American Home Assurance Company, claim that General Metals is solely at fault for overloading and capsizing the barge.  Manke Tug and American Home contend that General Metals is liable for barge salvage and repairs in the amount stipulated above, arguing that General Metals breached a verbal bareboat charter party, including breach of the warranty of workmanlike performance, and was negligent, both as a bailee and in tort.  Manke Tug also claims up to $36,000 in lost charter hire against General Metals, an amount not stipulated by defendants.

10.   General Metals is the owner and operator of a recycled metals facility located on the Hylebos Waterway in Tacoma, of which its dock is a part.  Although General Metals does business under the trade name Schnitzer Steel, for this case Schnitzer will refer to Schnitzer Steel Industries, Inc.  Schnitzer is the parent company and sole shareholder of

[PROPOSED] FINDINGS OF FACT AND
CONCLUSIONS OF LAW - 2
NO. C07-5494 RBL

ATTORNEYS AT LAW
BAUER MOYNIHAN & JOHNSON LLP
2101 FOURTH AVENUE - SUITE 2400
SEATTLE, WASHINGTON 98121-2320
(206) 443-3400

1   General Metals. At the time the barge capsized, Schnitzer and General Metals were operating

2   under a written Contract Processing Agreement between the two parties. General Metals and

3   Schnitzer counterclaim that the barge was unseaworthy when it was delivered on March 22,

4   2007, and seek damages in the amount stipulated above.

5        11.    The SEA SPRAY was built in 1966. It has a six-foot high cargo fence around

6   the perimeter, with an opening on both port and starboard sides to allow cargo to be

7   offloaded. The SEA SPRAY's draft at any given time is dependent on the weight of cargo

8   loaded on its deck.

9        12.    The SEA SPRAY is a converted caustic soda tank barge. When Manke Tug

10  bought the SEA SPRAY in 2004, it had the vessel surveyed, performed minor repairs to the

11  hull, and fabricated the cargo fence for it. At no time between entering service at the end of

12  2004 or early 2005, and the time it capsized in 2007, did Manke Tug ever have any problems

13  with the barge, nor did it ever leak to its knowledge.

14       13.    In August 2006, General Metals first chartered the SEA SPRAY from Manke

15  Tug at the fixed rate of $750 for each day used. General Metals loaded the SEA SPRAY with

16  3,535 tons of shredded steel on the barge, it was towed by another company to Nucor Steel

17  Seattle, Inc., a steel mill in Seattle, and returned to Manke Tug without incident. Manke Tug

18  had no involvement in the loading, towing, or discharge of the barge during that charter.

19       14.    Before the charter during which the SEA SPRAY capsized in March 2007,

20  General Metals chartered the barge on seven separate times, at the same rate of $750 for each

21  day used. For each use, General Metals loaded the barge with shredded steel owned by

22  Schnitzer, had it towed to Nucor, had the barge drafts measured to determine the amount of

23  steel delivered to Nucor, had the cargo discharged, and then had the SEA SPRAY returned to

24  Manke Tug. Of the seven charters with General Metals prior to capsize, Manke Tug towed

25  the SEA SPRAY twice, during the fourth and fifth charters, and for these towing services

26  separately charged General Metals in addition to barge rent; for the other five charters,

27  General Metals hired other companies to tow the SEA SPRAY. For all seven of these

[PROPOSED] FINDINGS OF FACT AND
CONCLUSIONS OF LAW - 3
NO. C07-5494 RBL

charters, Manke Tug had no involvement in the loading or discharge of the shredded steel cargo. It is unnecessary for me to find whether these seven charters were bareboat charters, although the facts support such a finding.

15.     General Metals always loaded the SEA SPRAY using only its own employees. The barge was always docked at the General Metals dock on the Hylebos Waterway, near where the shredded steel was produced and piled for transport and sale. General Metals' crane operators placed individual loads, called pans, of shredded steel onto the barge deck; each load was weighed and recorded by the General Metals crane scale and recorder.

16.     During the second charter, in September 2006, defendants loaded 3,928 tons of shredded steel on the barge. When loading a final pan of steel, the SEA SPRAY took what General Metals' crane operator, Mike Brazell, called a "scary roll" at the dock. The barge stayed upright, but it briefly listed so dramatically that Brazell thought it would capsize. This roll was witnessed by another General Metals employee, Rick Bowker. Both testified they were surprised by what they saw. They immediately reported what happened to their supervisor, foreman Gordy Curran. Curran reprimanded Brazell for loading so much steel on the SEA SPRAY.

17.     Curran then instructed all General Metals crane operators to load no more than 3,500 tons of shredded steel on the SEA SPRAY in the future. Curran also told Jim McCullough, General Metals' operations manager, that 3,500 tons was the load limit for the SEA SPRAY, and McCullough accepted the foreman's decision. The loaded barge was then towed to Nucor, discharged, and returned to Manke Tug without further incident.

18.     General Metals never told Joe Manke or Manke Tug about the "scary roll" incident, or that there were any problems with the SEA SPRAY during the September 2006 charter. General Metals continued to charter the SEA SPRAY for six additional months without any problems with the barge. For the next five charters in that six-month period, loading and towing proceeded without incident, and General Metals adhered to its self-imposed safe load limit, loading between approximately 3,100 and 3,500 tons of shredded

[PROPOSED] FINDINGS OF FACT AND
CONCLUSIONS OF LAW - 4
NO. C07-5494 RBL

ATTORNEYS AT LAW
**BAUER MOYNIHAN & JOHNSON LLP**
2101 FOURTH AVENUE - SUITE 2400
SEATTLE, WASHINGTON 98121-2320
(206) 443-3400

1   steel on the SEA SPRAY, and never more than 3,500 tons.

2       19.     At the completion of the last of those five charters, on March 20, 2007, during

3   offloading at the Nucor Steel facility some steel fell off the SEA SPRAY into the Duwamish

4   Waterway.  This resulted in a warning from the U.S. Environmental Protection Agency to

5   Nucor to prevent such an incident from recurring, which in turn warned General Metals.

6   McCullough called Joe Manke and asked whether he had any doors to block the side openings

7   of the barge.  Manke said no, and told McCullough that, if he did put in doors, not to load any

8   more steel than he had been loading.  McCullough assured him he would not.  General Metals

9   fabricated two side cargo doors and loaded them on the barge.

10      21.     On March 22, 2007, General Metals retrieved the SEA SPRAY from its

11  moorage nearby, hired Foss Maritime to tow it to the General Metals dock and stand by

12  during loading operations, to tow the loaded barge to Nucor in Seattle, and to return it to its

13  moorage.  A fairly new General Metals crane operator, Jose Rosas, proceeded to load about

14  3,400 tons of steel on the SEA SPRAY as he had been trained.  McCullough, however, told

15  Rosas to keep filling the barge, inexplicably stating that it could take 6,500 tons.  Rosas

16  continued to load as instructed, loading the SEA SPRAY with 4,019 tons of steel.  This

17  amount was 519 tons more than the load limit that General Metals had previously established

18  for the SEA SPRAY and had been adhering to since the "scary roll" incident six months

19  earlier.

20      22.     The overloaded barge was initially level, but some of the shredded steel had

21  spilled over the top of the cargo fence and onto the outside deck area of the barge, creating the

22  risk that steel might again fall off the barge during offloading at Nucor.  McCullough

23  therefore instructed the General Metals foreman on duty, Sean Morey, to "clean" the barge,

24  and Morey directed another crane operator, Jacob Solomon, to use a mobile magnet crane to

25  move the shredded steel away from the top of the fence and off the outside deck areas.

26  Solomon moved the steel toward the middle of the barge, piling the load higher and thus

27  raising the barge's center of gravity.

[PROPOSED] FINDINGS OF FACT AND
CONCLUSIONS OF LAW - 5
NO. C07-5494 RBL

1    23.    At one point during this repositioning of the steel cargo, the overloaded barge

2    took on a pronounced list at the dock.  The captain of the Foss Maritime tug preparing to tow

3    the barge believed the list was 14-15 inches.  Solomon was worried about the list and alerted

4    his supervisor, Morey, but instead of stopping the loading procedure or removing steel from

5    the barge, Morey told Solomon to keep cleaning the barge.  Solomon continued to move the

6    shredded steel away from the edge to the middle of the barge until the barge suddenly

7    capsized at the dock, spilling all 4,019 tons of Schnitzer's steel into Hylebos Waterway.

8    24.    The SEA SPRAY capsized because it was overloaded by General Metals far

9    beyond its safe load capacity and because General Metals failed to stop the cargo

10    repositioning operations when the barge had a visible, severe list at the General Metals dock.

11    The capsize was not caused by any actions by Manke Tug, even in part.

12    25.    Manke Tug had no control over the SEA SPRAY on March 22, 2007 when it

13    was chartered by General Metals.  General Metals took the barge from its moorage, arranged

14    for Foss to tow it and stand by during loading, fabricated the cargo doors for it, and loaded it

15    solely by its own employees and supervisors at its dock, all without any direction, control or

16    presence of Manke Tug.  In response to a Request for Admission admitted as an exhibit,

17    General Metals expressly admitted it had possession and control of the barge at the time it

18    capsized, and the Court finds that General Metals had exclusive possession and control of the

19    SEA SPRAY during the March 22, 2007 charter.

20    26.    The Court finds that the SEA SPRAY was seaworthy at the time it was

21    delivered to General Metals or about March 22, 2007, as it was reasonably fit for its intended

22    service.  General Metals had established it only needed the SEA SPRAY to haul up to 3,500

23    tons of steel, and on the day of capsize only approximately 2,610 tons of steel remained

24    unperformed under its contract with Nucor.  Furthermore, there is no admissible evidence,

25    only speculation, that any slack water found in the barge after it capsized was present when

26    General Metals loaded the barge at its dock that day.

27

[PROPOSED] FINDINGS OF FACT AND
CONCLUSIONS OF LAW - 6
NO. C07-5494 RBL

1    27.    The SEA SPRAY was righted in a salvage operation, then repaired.  According

2  to Joe Manke, this kept the SEA SPRAY out of service for approximately 48 days.  At the

3  rate of $750/day, the lost charter hire is $36,000.

**CONCLUSIONS OF LAW**

5    1.    This Court has jurisdiction over the subject matter of this case as an admiralty

6  and maritime claim pursuant to the Court's admiralty jurisdiction under 28 U.S.C. §1333(1).

7  Venue is proper.

8    2.    When an empty barge, without any crewmembers, is let by the owner to a

9  charterer, the charter is usually a bareboat or demise charter.  *Agrico Chemical Co. v. M/V*

10  *BEN W. MARTIN*, 664 F.2d 85, 91 (5th Cir. 1981); *Petition of Shaver Transp. Co.*, 287 F.

11  Supp. 339 (D. Or. 1967); *Marstaller v. Albina Dock Co.*, 191 Ore. 145, 155 (1951).

12    3.    Bareboat or demise charters may be oral.  *Shaver Transp. Co.*, *supra.*  Control

13  is the critical issue to determine whether a bareboat charter exists.  *Franicevich v. Caillou*

14  *Island Towing Co.*, 732 So. 2d 93, 96 (La. App. 1999); *Willamette-Western Corp. v.*

15  *Columbia Pacific Towing Co.*, 466 F.2d 1390, 1391 (9th Cir. 1972).  Because General Metals

16  had exclusive possession and control over the barge, General Metals was a bareboat charterer

17  of the SEA SPRAY on March 22, 2007.

18    4.    As a bareboat charterer, General Metals was the bailee of the SEA SPRAY.

19  *Western Transportation Co. v. Pac-Mar Services, Inc.*, 376 F. Supp. 530, 535 (D. Ore. 1974),

20  *aff'd* 547 F.2d 97 (9th Cir. 1976); *The E.T. Halloran*, 111 F.2d 571 (2d Cir. 1940), *cert.*

21  *denied*, 311 U.S. 691 (1940).  As such, General Metals was under an obligation to use

22  reasonable care to protect the barge.

23    5.    When a vessel is provided to a bailee in a seaworthy condition and is returned

24  damaged, a presumption arises that the bailee was negligent, and the bailee is liable unless it

25  can rebut the presumption by proving that it was not negligent.  *Consolidation Coal Co. v.*

26  *United States Steel Corp.*, 364 F. Supp. 1071, 1073 (W.D. Pa. 1973); *Stoufflet v. Cenac*

27  *Towing Co.*, 236 F. Supp. 198, 201 (E.D. La. 1964), *aff'd* 356 F.2d 984 (5th Cir. 1966).

6.      As the Court found above, the SEA SPRAY was seaworthy when it was delivered to General Metals on March 22, 2007. The Court also concludes that, even for any evidence supporting the contention that the barge was unseaworthy, which the Court does not find credible or persuasive, General Metals waived the warranty of seaworthiness for the barge based on its prior use as found above between September 2006 and March 22, 2007, when General Metals set the load limit at 3,500 tons and continued to charter the barge without reporting any problems. *Tidewater Barge Lines, Inc. v. Port of Lewiston*, 2006 A.M.C. 542, 553-54 (D. Or. 2005)(*citing Dant & Russell, Inc. v. Dillingham Tug & Barge Corp.*, 877 F.2d 1404, 1407 (9th Cir. 1989)). General Metals also failed to prove that it was not negligent in its care and custody of the SEA SPRAY the day it capsized.

7.      By returning the SEA SPRAY in a damaged condition, General Metals breached the bareboat charter agreement, and is liable for plaintiffs' stipulated damages totaling $267,903.14. In addition, General Metals is liable for lost charter hire in the amount of $36,000.00. *Compass Marine Corp. v. Calore Rigging Co.*, 716 F. Supp. 176, 181 (E.D. Pa. 1989), *aff'd*, 891 F.2d 279 (3d Cir. 1989); *Skou v. United States*, 478 F.2d 343, 347-48 (5th Cir. 1973); *Moore-McCormack Lines, Inc. v. The Esso Camden,* 141 F. Supp. 742, 745 (S.D.N.Y. 1956), *modified,* 244 F.2d 198 (2d Cir.), *cert. denied,* 355 U.S. 822 (1957).

8.      In overloading and causing the SEA SPRAY to capsize, General Metals also violated its warranty of workmanlike performance to Manke Tug under the bareboat charter. *Hamilton v. Canal Barge Co.*, 395 F. Supp. 978, 990 (E.D. La. 1975), *disapproved on other grounds in Culver v. Slater Boat Co.*, 688 F.2d 280 (5th Cir. 1982)(*citing Nichimen Co. v. M. V. Farland*, 462 F.2d 319 (2d Cir. 1972)); R. Bauer, "Responsibilities of Owner and Charterer to Third Parties—Consequences Under Time and Voyage Charters," 49 Tul. L. Rev. 995, 1014-15 (1975).

9.      General Metals was solely negligent in overloading and causing the SEA SPRAY to capsize, and for which it was 100% at fault.

ATTORNEYS AT LAW
BAUER MOYNIHAN & JOHNSON LLP
2101 FOURTH AVENUE - SUITE 2400
SEATTLE, WASHINGTON 98121-2320
(206) 443-3400

10.     Under maritime law, prejudgment interest is virtually automatic, and the local rate is used for fair and just compensation of losses when equitable. *Todd Shipyards Corp. v. Auto Transp. S.A.*, 763 F.2d 745, 753 (5th Cir. 1985). The Court awards plaintiffs prejudgment interest at 12% under Washington law for breach of the charter contract, RCW 19.52.010(1), as the Court finds such award equitable under the circumstances. For the $36,000 in charter hire accrued on May 9, 2007, the salvage payment of $185,000 on May 16, 2007, the survey fee payment of $13,854.87 on August 21, 2007, and the repair payment of $69,048.27 on August 29, 2007, prejudgment interest at 12% totals $46,622.78.

11.     Plaintiffs' total damages for which General Metals is liable is $350,586.61.

12.     As a third party with which Manke Tug had not contracted on the bareboat charter, Manke Tug is not liable to Schnitzer for its claimed losses. *Dant & Russell, Inc. v. Dillingham Tug & Barge Corp.*, 877 F.2d 1404, 1407 (9th Cir. 1989); *Western Transp. Co. v. Pac-Mar Services, Inc.,* 376 F. Supp. 530 (D. Ore. 1974).

13.     Defendants failed to prove their counterclaims. Manke Tug was not negligent and did not provide an unseaworthy vessel, therefore there was no breach of implied warranty or breach of contract. Under the Contract Processing Agreement between General Metals and Schnitzer, Schnitzer's sole basis for recovery of its losses is against General Metals. However, there was no cross claim between defendants in this lawsuit. Defendants therefore shall recover nothing.

14.     Any finding of fact above that is properly a conclusion of law, and any conclusion of law above that is properly a finding of fact, shall be deemed as such.

The Court directs the clerk to enter judgment for plaintiffs against General Metals of Tacoma, Inc. in the amount of $350,586.61. Further, judgment is entered for plaintiffs on

///
///
///
///

[PROPOSED] FINDINGS OF FACT AND
CONCLUSIONS OF LAW - 9
NO. C07-5494 RBL

ATTORNEYS AT LAW
BAUER MOYNIHAN & JOHNSON LLP
2101 FOURTH AVENUE - SUITE 2400
SEATTLE, WASHINGTON 98121-2320
(206) 443-3400

1  defendants' counterclaims, and defendants' counterclaims are dismissed with prejudice.

2

3          DONE IN OPEN COURT this _____day of _____, 2008.

4

5                                    _____

6                                    RONALD B. LEIGHTON
                                     UNITED STATES DISTRICT JUDGE

7

8  Presented by:

9
   BAUER MOYNIHAN & JOHNSON LLP
10
   _[signature]_
11

12 _____
   Matthew C. Crane, WSBA 18003
13 Attorneys for Plaintiffs Manke Tug & Barge Co., Inc.
   and American Home Assurance Company

14

15

16 I declare under penalty of perjury of the laws of the state of Washington
   that on 11/13___, 2008, I electronically filed the foregoing document
17 with the Clerk of the Court using the CM/ECF system which will send
   notification of such filing to the following:
18

19 Christopher W. Nicoll
   Larry E. Altenbrun
20 Nicoll Black & Feig PLLC
   816 Second Avenue, Suite 300
21 Seattle, WA 98104
   Tel: 206-838-7555
22 Fax: 206-838-7515
   cnicoll@nicollblack.com
23 laltenbrun@nicollblack.com

24 BAUER MOYNIHAN & JOHNSON LLP

25 /s/ Justin Fodness

26 _____
   Justin Fodness
27 jkfodness@bmjlaw.com

   [PROPOSED] FINDINGS OF FACT AND                    ATTORNEYS AT LAW
   CONCLUSIONS OF LAW - 10                   BAUER MOYNIHAN & JOHNSON LLP
   NO. C07-5494 RBL                             2101 FOURTH AVENUE - SUITE 2400
                                                SEATTLE, WASHINGTON 98121-2320
                                                        (206) 443-3400