THE HON. RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

MANKE TUG & BARGE CO., INC.; and
AMERICAN HOME ASSURANCE
COMPANY,

         Plaintiffs,

v.

SCHNITZER STEEL INDUSTRIES, INC.; and
GENERAL METALS OF TACOMA, INC. d/b/a
SCHNITZER STEEL,

         Defendants.

IN ADMIRALTY

NO. C07-5494 RBL

PLAINTIFFS' TRIAL BRIEF

## INTRODUCTION

This case is about the legal responsibility to pay for damage to a capsized barge.

On March 22, 2007, General Metals of Tacoma knowingly overloaded the barge SEA SPRAY with more than 500 tons of steel beyond the barge's safe load capacity, while under General Metals' sole possession and control. It overloaded the barge to make more money for Schnitzer Steel, its parent company. Even after seeing warning signs of a severely listing vessel, General Metals continued the loading operations until the barge capsized at its dock.

When Manke Tug & Barge and its hull insurer filed suit to recover their losses, General Metals and Schnitzer filed a punitive counterclaim on the contrived basis that the barge was unseaworthy, even though General Metals had chartered the barge in the exact same condition eight times before it capsized. Defendants are liable for plaintiffs' damages.

PLAINTIFFS' TRIAL BRIEF - 1
NO. C07-5494 RBL

ATTORNEYS AT LAW
BAUER MOYNIHAN & JOHNSON LLP
2101 FOURTH AVENUE - SUITE 2400
SEATTLE, WASHINGTON 98121-2320
(206) 443-3400

# FACTS

## 1. The SEA SPRAY

The SEA SPRAY is a flat-deck steel barge, 250 feet long and 50 feet wide owned by Manke Tug & Barge Co., Inc. (Manke Tug). It has a six-foot high cargo fence around the perimeter, with openings at the sides of the fence to allow cargo to be offloaded. The SEA SPRAY has an 18½ foot depth, and its draft (the portion of the hull's depth underwater) at any given time depends on the weight of cargo loaded on the barge.

Joe Manke, the sole owner of Manke Tug, bought the barge in early 2004, primarily to haul wood veneer from southeastern Vancouver Island, but it was also used to haul gravel and scrap metal in Puget Sound. The barge was built in 1966, and although it was in good condition it needed minor repairs, which were completed by Duwamish Shipyard in Seattle. Manke Tug then placed concrete over a thin section of bottom plate between two frames to ensure the plate was fully covered and sealed in that area, which acted as approximately 120 tons of permanent ballast. Fill ports were also installed to allow additional ballast water to be added to several bottom ballast tanks as necessary. Lastly, Manke Tug built the cargo fence for the deck, and in late 2004 or early 2005 the barge was placed into service. To Joe Manke's knowledge, the barge never leaked.

Because it is used for hauling veneer, scrap metal and gravel in the Puget Sound/southeastern Vancouver Island area, the SEA SPRAY does not need a load line, a regulatory mark on the outside of the hull identifying its maximum loaded draft. 46 U.S.C. § 5102(b)(9); 46 C.F.R. 42.03-35. In addition, as an uninspected vessel, there are no Coast Guard regulations applicable to the SEA SPRAY concerning stability. 46 C.F.R. § 170.001.

When it wasn't being used to haul gravel or wood, Manke Tug regularly moored the SEA SPRAY at the head of the Hylebos Waterway, close to the General Metals steel shredding facility. Manke Tug is not in the barge chartering business. It has one barge, the SEA SPRAY, for its own use, and shares another barge with an affiliated company. Until recently, it also had only one tug to tow the SEA SPRAY.

PLAINTIFFS' TRIAL BRIEF - 2
NO. C07-5494 RBL

ATTORNEYS AT LAW
BAUER MOYNIHAN & JOHNSON LLP
2101 FOURTH AVENUE - SUITE 2400
SEATTLE, WASHINGTON 98121-2320
(206) 443-3400

## 2. General Metals and Schnitzer Steel

General Metals of Tacoma operates one of the largest scrap metal yards in Puget Sound. Scrap metal, mostly steel, is trucked or moved by rail to its facility and then shredded in a large steel shredding plant. The shredded steel produced from the plant is piled up on its property, and loaded onto bulk carrier ships and barges at its dock, for sale to its customers. General Metals is a wholly owned subsidiary of Schnitzer Steel Industries, Inc., a publicly-traded company which owns the steel sold by General Metals. An overview of Schnitzer's metals recycling business can be found at www.schnitzersteel.com.

One of General Metals' customers is Nucor Steel Seattle, Inc., a steel mill in West Seattle. Nucor buys steel from General Metals in shredded form, then melts it and fabricates it into various shapes. General Metals does not own its own barges, so it routinely charters them from others to transport the steel from its facility in Tacoma to Nucor in Seattle. Although the contracts are between General Metals and Nucor, the steel itself is owned by Schnitzer until delivered to Nucor. Typically, General Metals chartered deck barges from Foss Maritime and Western Towboat, but they were not always available, and deck barges are in short supply in Puget Sound.

## 3. The First of Eight Bareboat Charters

In August 2006, General Metals first chartered the SEA SPRAY from Manke Tug. General Metals' former operations manager, Jim McCullough, asked Joe Manke to let him use the SEA SPRAY. Manke told him it was not for hire, but McCullough persisted as he was desperate to find a barge to fill a contract with Nucor. Ultimately, Manke relented to do McCullough a favor at a time when Manke Tug was not using the barge. In August 2006, Manke Tug allowed General Metals to use the SEA SPRAY for the fixed rate of $750/day. This was a verbal bareboat charter, as were all Manke Tug's charters with General Metals.

Prior to the first charter by General Metals, the SEA SPRAY was twice used in 2005 to haul scrap steel from a supplier to the General Metals dock. General Metals told Manke Tug that it needed a displacement table for the barge to measure the weight of scrap steel

PLAINTIFFS' TRIAL BRIEF - 3
NO. C07-5494 RBL

ATTORNEYS AT LAW
BAUER MOYNIHAN & JOHNSON LLP
2101 FOURTH AVENUE - SUITE 2400
SEATTLE, WASHINGTON 98121-2320
(206) 443-3400

being unloaded, so Manke Tug hired Columbia-Sentinel Engineers to prepare a displacement table. That table identifies the weight of cargo at various drafts of the barge, allowing the cargo weight to be calculated by subtracting the empty draft from the loaded draft. That table was prepared in May 2005, and provided to General Metals. General Metals never requested a stability analysis for the SEA SPRAY, even after it first agreed to charter the barge to haul shredded steel to Nucor in 2006. The only formal report General Metals ever asked for and received for the SEA SPRAY was the displacement table in May 2005.

For the first charter, as well as the seven that followed it, General Metals hired the SEA SPRAY at the fixed rate of $750 for each day of use. For each charter, General Metals arranged for a towing company to retrieve the barge from its mooring at the head of Hylebos Waterway, had it towed to the General Metals dock, loaded the empty barge solely using its own crane operators and supervisors, loaded the amount of steel and with the configuration that it alone decided, had it towed to Nucor Seattle and the cargo discharged there, then had the barge towed back to Tacoma and returned the barge to its moorage. General Metals always loaded the SEA SPRAY using its own employees, and Manke Tug never had any involvement whatsoever in the loading, stowing, or discharging of the barge's cargo.

To determine the weight of the shredded steel loaded on the SEA SPRAY, General Metals' crane operators dropped individual loads—called pans—of shredded steel onto the barge deck, in small piles, after each load was weighed and recorded by the crane's scale and recorder. After the barge loading was completed, General Metals hired the marine surveying firm Alexander Gow to measure the barge's loaded and empty drafts to confirm the actual loaded weight of the shredded steel for purposes of sale, which was on a per-ton basis. For the first bareboat charter in August 2006, General Metals loaded 3,535 tons of steel on the SEA SPRAY, and it was towed to Nucor and returned without incident.

### 4. The "Scary Roll" and the Safe Load Limit

During the second verbal bareboat charter, in September 2006, General Metals loaded 3,928 tons of shredded steel on the SEA SPRAY. When loading a final pan of steel, the barge
PLAINTIFFS' TRIAL BRIEF - 4
NO. C07-5494 RBL

ATTORNEYS AT LAW
BAUER MOYNIHAN & JOHNSON LLP
2101 FOURTH AVENUE - SUITE 2400
SEATTLE, WASHINGTON 98121-2320
(206) 443-3400

took what the crane operator, Mike Brazell, called a "scary roll" at the dock. The barge stayed upright, but it briefly listed so dramatically that Brazell thought it might capsize. This roll was witnessed by another General Metals employee, Rick Bowker. Both he and Brazell were very surprised at what they saw and immediately reported what happened to their supervisor, foreman Gordy Curran. Curran "scolded" Brazell for loading so much steel on the SEA SPRAY. Curran then instructed all crane operators that, in the future, no more than 3,500 tons of shredded steel was to be loaded on that barge. Curran also told McCullough, General Metals' operations manager, that 3,500 tons was the safe load limit for the SEA SPRAY, and McCullough accepted Curran's decision. The barge, loaded with 3,928 tons of steel, was then towed to Nucor, unloaded, and returned to Manke Tug without incident.

General Metals never told Manke Tug about the scary roll, or that there was any problem whatsoever with the SEA SPRAY. General Metals never hired a marine surveyor to inspect the barge, or took any other steps to ascertain its condition or load capacity. It clearly understood that it had overloaded the SEA SPRAY, and imposed a safe load limit when using it thereafter. General Metals then continued to charter the SEA SPRAY from Manke Tug for another six months without saying a word to Manke Tug about its condition or load capacity. Thus, it is clear that General Metals explicitly accepted the barge's 3,500 ton load capacity for shredded steel, and thus its complete fitness for that purpose.

5. **The Next Five Charters Prior to Capsize**

For the next five bareboat charters between October 2006 and March 20, 2007, General Metals loaded and used the SEA SPRAY without incident. General Metals adhered to its own, internally-determined safe load limit for that barge, loading the following amounts of shredded steel: (1) 3,211 tons; (2) 3,102 tons; (3) 3,227 tons; (4) 3,208 tons; and (5) 3,492 tons. All charters were successfully completed and the SEA SPRAY was returned each time to its mooring.

However, near the completion of the last of these five verbal bareboat charters, on March 20, 2007, during the offload at Nucor's facility, some steel fell off the barge and into

PLAINTIFFS' TRIAL BRIEF - 5
NO. C07-5494 RBL

ATTORNEYS AT LAW
BAUER MOYNIHAN & JOHNSON LLP
2101 FOURTH AVENUE - SUITE 2400
SEATTLE, WASHINGTON 98121-2320
(206) 443-3400

the Duwamish Waterway. This resulted in a warning from the U.S. Environmental Protection Agency to Nucor demanding that Nucor prevent such an incident from recurring. Nucor, in turn, instructed General Metals that it was imperative that no shredded steel be dropped in the waterway. McCullough then called Joe Manke and asked whether he had any doors to block the side openings in the SEA SPRAY cargo fence to prevent steel from falling out. Manke said no, and told McCullough that, if he did put in doors, not to load any more steel than General Metals had been loading. McCullough assured him he would not.

### 6. The Second Overloading and Capsize

However, McCullough immediately broke that promise. On March 22, 2007, within just a few days of giving that assurance, General Metals was loading the SEA SPRAY for the eighth (and final) bareboat charter to Nucor. In order to complete its contract with Nucor, General Metals needed to haul only 2,610 tons of steel to Nucor's facility, and to prevent the steel from falling off it fabricated two makeshift cargo doors and installed them on the barge. A fairly new crane operator, Jose Rosas, loaded the barge at General Metals' dock with about 3,400 tons of steel (800 tons more than needed to complete the Nucor contract, but within the limit he had been told by Brazell during his training). Then, inexplicably, McCullough told Rosas to keep filling the barge, stating that it could take 6,500 tons. Because the new cargo doors had been installed, there was room for more steel on the barge. Although Rosas did not think it was right to keep loading it, he did as he was told.

Rosas filled the SEA SPRAY with 4,019 tons of steel, which was recorded on the crane scale. This was 519 tons more than the safe limit of 3,500 tons, the load limit established by General Metals after the first overloading six months earlier. The once again-overloaded barge was initially level, but due to its heavily loaded condition, some of the shredded steel had spilled over the top of the cargo fence and onto the outside deck area of the barge. This created the hazard that the steel might spill off the barge at Nucor's facility and cause a recurrence of the environmental incident General Metals and Nucor had been warned about. Thus, McCullough instructed the General Metals foreman on duty, Sean Morey, to

PLAINTIFFS' TRIAL BRIEF - 6
NO. C07-5494 RBL

ATTORNEYS AT LAW
BAUER MOYNIHAN & JOHNSON LLP
2101 FOURTH AVENUE - SUITE 2400
SEATTLE, WASHINGTON 98121-2320
(206) 443-3400

have another crane operator "clean" the barge by using a mobile magnet crane to lift some of the shredded steel away from the top of the fence and off the outside deck areas. The only place to put the steel, however, was in the middle of the barge, piling the load even higher and raising its center of gravity.

When the steel was being piled higher during cleaning, the barge took on a dangerous list at the dock. The Foss Maritime tug captain who was preparing to tow the barge to Nucor noticed the list and said it was 14-15 inches. For a barge of that size, loaded that high and heavy, it was a clear sign of danger. The General Metals mobile crane operator, Jacob Solomon, was alarmed by the dangerous list and told his supervisor, Morey. But instead of immediately stopping the loading procedure, and removing steel to lighten and level the barge, Morey told Solomon to keep cleaning the barge, which meant piling more steel in the middle of the barge and further raising the center of gravity, which was now already shifting to one side. The inevitable then happened. The barge suddenly capsized at the dock, spilling all 4,019 tons of Schnitzer's steel into the Hylebos Waterway.

The barge was later righted in a salvage operation, and repaired, at a total cost of $267,903.14, the amount stipulated by the parties. In addition, during the period of repairs the SEA SPRAY was out of service for approximately 1½ months. The daily charter rate when the barge capsized was $750.

## LIABILITY

Liability in this case is straightforward. The SEA SPRAY was bareboat chartered by Manke Tug to General Metals. In a bareboat charter, the bareboat charterer has sole possession and control of the vessel. This gives rise to a bailor-bailee relationship, where the bareboat charterer is the bailee.

As the bareboat charterer and bailee, General Metals is solely responsible for any loss or damage to the barge during the bareboat charter period, unless it can prove it was not negligent. In addition, there is a warranty of workmanlike performance that runs from the charterer to the owner when loading cargo. This is the governing federal maritime law.

PLAINTIFFS' TRIAL BRIEF - 7
NO. C07-5494 RBL

ATTORNEYS AT LAW
BAUER MOYNIHAN & JOHNSON LLP
2101 FOURTH AVENUE - SUITE 2400
SEATTLE, WASHINGTON 98121-2320
(206) 443-3400

### 1. Bareboat Charter

There are two principal kinds of vessel charters: (1) bareboat, also called demise, charters; and (2) time or voyage charters. As explained by the Louisiana Court of Appeals:

> A "bareboat" or demise charter requires a "complete transfer of possession, command, and navigation of the vessel from the owner to the charterer." *Agrico Chemical Co. v. M/V Ben W. Martin*, 664 F.2d 85, 91 (5th Cir. 1981); *Gaspard v. Diamond M. Drilling Co.*, 593 F.2d 605, 606 (5th Cir. 1979). A demise is "tantamount to, though just short of, an outright transfer of ownership." *Guzman v. Pichirilo*, 369 U.S. 698, 82 S. Ct. 1095, 8 L. Ed. 2d 205 (1962). It need not be in writing. *Agrico Chemical Co.*, 664 F.2d at 91.
>
> A vessel may also be chartered for a single voyage ("voyage charter"), or for a fixed period of time ("time charter"). In the case of conventional vessels, the owner remains in control during such charters, and provides the master and crew. Because barges lack power and usually have no crew, contracts for the mere use of a barge are usually bareboat. The owner may not only charter the barge but may also provide a tow and remain in control of the barge. *Agrico Chemical Co.*, 664 F.2d at 91. This designation is not always inevitable.
>
> Whatever the nature of the vessel, the rules concerning responsibility for its operation are the same. If the owner retains control, he remains liable for all damages arising out of its operation whether the charter is only for a single voyage ("voyage charter") or for a fixed time ("time charter"). If the charter is a demise charter, the charterer is responsible. *Agrico Chemical Co.*, 664 F.2d at 91.

*Cantrelle v. Kiva Const. & Engr. Co.*, 630 So.2d 265, 273 (La. App. 1993).

Bareboat charters may be written or oral, and are often oral. *Petition of Shaver Transp. Co.*, 287 F. Supp. 339, 342 (D. Ore. 1967) (finding that the oral charter of a non-powered barge constituted a demise, noting that "such oral charters are not uncommon"); *Marstaller v. Albina Dock Co.*, 191 Ore. 145, 155, 229 P.2d 269, 273 (1951) ("In the instant case we have an oral charter of this barge. It is generally held that oral charters of barges in local harbors constitute demises. This is particularly true of a barge without motive power."). Oral contracts are fully enforceable under maritime law. *Kossick v. United Fruit Co.*, 365 U.S. 731, 734 (1961) ("it is an established rule of ancient respectability that oral contracts are generally regarded as valid by maritime law").

Generally, when an empty barge, without any crewmembers, is let by the owner to

PLAINTIFFS' TRIAL BRIEF - 8
NO. C07-5494 RBL

ATTORNEYS AT LAW
BAUER MOYNIHAN & JOHNSON LLP
2101 FOURTH AVENUE - SUITE 2400
SEATTLE, WASHINGTON 98121-2320
(206) 443-3400

1  someone else, the charter is deemed to be a bareboat charter. *Agrico Chemical Co. v.*
2  *M/V BEN W. MARTIN*, 664 F.2d 85, 91 (5th Cir. 1981)("[b]ecause barges lack power and
3  usually have no crew, contracts for the mere use of a barge are usually bareboat")(*citing* A.
4  Parks, *The Law of Tug, Tow and Pilotage* 394 (1971)). *See also Cantrelle, supra* (same);
5  *Tidewater Barge Lines v. Port of Lewiston*, 2006 A.M.C. 542, 555, 2005 U.S. Dist. Lexis
6  41947 *31-32 (D. Ore. 2005)(same); *Marstaller v. Albina Dock Co., supra* ("It is generally
7  held that oral charters of barges in local harbors constitute demises. This is particularly true
8  of a barge without motive power."). Thus, unless the owner remains in possession and
9  control, the rental of a mere barge without a tug or crew is normally a bareboat charter.

10  Control is the "<u>critical issue</u> to determine whether a bareboat charter exists."
11  *Franicevich v. Caillou Island Towing Co.*, 732 So. 2d 93, 96 (La. App. 1999)(*citing Agrico*
12  *Chemical, supra*)(emphasis by the court). The Ninth Circuit has stated the rule similarly:

> First, as we view the facts here, C-P [Columbia-Pacific Towing Co.] was a demise, not a time, charterer. *The critical issue in placing liability for damage to a vessel is one of control.* If C-P directed the operation of the ATLAS, then it was potentially liable for injury thereto. The District Court found that C-P's employees were "negligent in directing the loading operation." *On this finding, we think it was also required that C-P be deemed a demise charterer.*

18  *Willamette-Western Corp. v. Columbia Pacific Towing Co.*, 466 F.2d 1390, 1391 (9th Cir.
19  1972)(emphasis added).

20  Manke Tug did not have possession or control of the SEA SPRAY when it was
21  chartered to General Metals on March 22, 2007. General Metals hired Foss Maritime to
22  retreive the barge from its moorage and tow it to General Metals' dock, arranged for Foss to
23  stand by and turn the barge during loading operations, and arranged for Foss to tow it loaded
24  to Seattle. General Metals also fabricated the cargo fence doors for it, loaded 4,019 tons of
25  steel on it—519 tons in excess of its known safe load limit—using its own employees and
26  supervisors at its dock, and cleaned the barge of its spilled cargo.
27  Furthermore, before loading was completed General Metals repositioned the cargo on

PLAINTIFFS' TRIAL BRIEF - 9
NO. C07-5494 RBL

ATTORNEYS AT LAW
BAUER MOYNIHAN & JOHNSON LLP
2101 FOURTH AVENUE - SUITE 2400
SEATTLE, WASHINGTON 98121-2320
(206) 443-3400

the barge away from the top of the cargo fence, and when it started to list heavily to the concern of General Metals' crane operator, it was the General Metals foreman who directed the cargo operator to continue to reposition the steel, piling the steel toward the direction of the list until the barge capsized. It is undisputed that General Metals took all of these actions without any direction, presence or control whatsoever of Manke Tug.

Moreover, in a response to a formal request for admission, General Metals also expressly admitted it had possession and control of the barge at the time it capsized:

> REQUEST FOR ADMISSION NO. 1: Admit that on March 22, 2007, at the time the barge SEA SPRAY capsized, defendant General Metals of Tacoma, Inc. had possession and control of the barge SEA SPRAY.
>
> RESPONSE: Objection. The terms possession and control have not been defined and therefore we do not know what you mean. Without waiving this objection, *admit that GMTI [General Metals of Tacoma, Inc.] had possession and control of the SEA SPRAY.*

Plaintiff's First Set of Discovery Requests to General Metals of Tacoma, Inc. Including Requests for Admission, and Answers and Objections Thereto, dated July 28, 2008 (emphasis added).

There is no doubt that Manke and General Metals entered into a bareboat charter when the SEA SPRAY was chartered on March 22, 2007.

    **2.**    **Bailment and the Presumption of Negligence**

As the bareboat charterer, General Metals was a bailee of the SEA SPRAY. *Western Transportation Co. v. Pac-Mar Services, Inc.*, 376 F. Supp. 530, 535 (D. Ore. 1974), *aff'd* 547 F.2d 97 (9th Cir. 1976)("When Western chartered Barge to Pac-Mar, the latter became bailee, and, as such, was under obligation to use reasonable care to protect it.")(citing *Washington Tug and Barge v. Weyerhaeuser Timber Co.*, 22 F.2d 665 (9th Cir. 1927); *The E.T. Halloran*, 111 F.2d 571 (2d Cir. 1940), *cert. denied*, 311 U.S. 691 (1940)). As such, General Metals was under the "obligation to use reasonable care to protect" the SEA SPRAY. *Id.*

The owner of a vessel must furnish a vessel in seaworthy state at the time it is delivered to the bareboat charterer. *Agrico Chemical Co., supra* (*citing* G. Gilmore & C.

PLAINTIFFS' TRIAL BRIEF - 10
NO. C07-5494 RBL

ATTORNEYS AT LAW
BAUER MOYNIHAN & JOHNSON LLP
2101 FOURTH AVENUE - SUITE 2400
SEATTLE, WASHINGTON 98121-2320
(206) 443-3400

Black, *The Law of Admiralty* 241 (2d ed. 1975)). A vessel is seaworthy if it is "reasonably fit" for its intended use. *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550 (1960).

The SEA SPRAY was undeniably seaworthy on March 22, 2007. It was clearly fit for the purpose of carrying 3,500 tons of shredded steel, the limit established by General Metals itself for its own use in September 2006, and continuously in place for the next six months. In that entire six-month period, General Metals successfully loaded and hauled between 3,100 and 3,500 tons on shredded steel on the barge, including the last charter when it transported 3,492 tons of shredded steel to Nucor. In that six month period, the barge's condition was exactly the same; its light displacement weight was virtually identical throughout that period, within the margin of error of Alexander Gow's measurements. By setting the safe load limit at 3,500 tons and continuing to charter the barge for six months after the "scary roll" incident under those same conditions, without saying a word to Manke Tug, General Metals concluded it was perfectly seaworthy to carry 3,500 tons of steel.

When a vessel is delivered in a seaworthy condition, "a presumption arises that the bailee was negligent and the bailee is liable unless he can rebut the presumption by showing that he was not negligent." *Consolidation Coal Co. v. United States Steel Corp.*, 364 F. Supp. 1071, 1073 (W.D. Pa. 1973)(*citing The E.T. Halloran, supra*). In other words, if the owner "shows delivery in good condition of the vessel to the charterer, and that the vessel has been returned in a damaged condition … then a presumption of negligence on the part of the charterer is raised. The burden then rests upon the respondent-charterer to go forward with exculpatory evidence to overcome the presumption of negligence." *Stoufflet v. Cenac Towing Co.*, 236 F. Supp. 198, 201 (E.D. La. 1964), *aff'd* 356 F.2d 984 (5th Cir. 1966).

As such, the burden is on General Metals to show that it was not negligent—a burden it cannot meet given that it knowingly overloaded the barge with 519 tons more than the maximum safe load limit that General Metals itself established, and given its failure to stop the loading operations when it became aware of the dangerous list of the overloaded barge. Thus, General Metals is fully responsible for all loss and damage to the barge as a result of

PLAINTIFFS' TRIAL BRIEF - 11
NO. C07-5494 RBL

ATTORNEYS AT LAW
BAUER MOYNIHAN & JOHNSON LLP
2101 FOURTH AVENUE - SUITE 2400
SEATTLE, WASHINGTON 98121-2320
(206) 443-3400

overloading and capsizing the SEA SPRAY. *See Shaver, supra* (charterer found liable for capsizing barge due to overloading); *Willamette-Western Corp., supra* (same).

Because a vessel owner is entitled to its charter hire until the vessel is returned in good condition, *Compass Marine Corp. v. Calore Rigging Co.*, 716 F. Supp. 176, 181 (E.D. Pa. 1989), *aff'd*, 891 F.2d 279 (3d Cir. 1989), General Metals is also liable for the $750/day charter hire until the SEA SPRAY was returned to service. *See also Skou v. United States*, 478 F.2d 343, 347-48 (5th Cir. 1973)(for vessel damaged under charter and off-hire, loss to the owner can be computed by calculating the lost charter hire and deducting any savings to the owner attributable to the ship being out of service); *Moore-McCormack Lines, Inc. v. The Esso Camden*, 141 F. Supp. 742, 745 (S.D.N.Y. 1956), *modified*, 244 F.2d 198 (2d Cir.), *cert. denied*, 355 U.S. 822 (1957)(charter party rate is proper and persuasive evidence for measuring a vessel's detention damages). There was no savings from the unmanned barge SEA SPRAY being out of service, thus the loss to Manke Tug is $750/day.

3. **Breach of Warranty of Workmanlike Performance**

Unless excluded by agreement, there is generally a warranty of workmanlike performance between parties to a maritime service contract. T. Schoenbaum, *Admiralty and Maritime Law* § 5-8 at 222 (4th ed. 2004). Although its origin was the stevedore's contract with the shipowner, "circuit courts of appeal are in agreement, however, that the workmanlike warranty applies to non-stevedore maritime contractors and subcontractors." *United States v. San Francisco Elevator Co.*, 512 F.2d 23, 26 (9th Cir. 1975). Under this warranty, the maritime service contractor "has a duty to perform his or her task with reasonable care, skill and diligence." Schoenbaum, *supra*, at 219.

The warranty of workmanlike performance also extends to charter parties. *See Hamilton v. Canal Barge Co.*, 395 F. Supp. 978, 990 (E.D. La. 1975), *disapproved on other grounds in Culver v. Slater Boat Co.*, 688 F.2d 280 (5th Cir. 1982)(*citing Nichimen Co. v. M. V. Farland*, 462 F.2d 319 (2d Cir. 1972))(demise charterer has an obligation to indemnify the vessel owner when the charterer operates the vessel in a manner subjecting the vessel or

PLAINTIFFS' TRIAL BRIEF - 12
NO. C07-5494 RBL

ATTORNEYS AT LAW
BAUER MOYNIHAN & JOHNSON LLP
2101 FOURTH AVENUE - SUITE 2400
SEATTLE, WASHINGTON 98121-2320
(206) 443-3400

vessel owner to liability for unseaworthiness). *See also* R. Bauer, "Responsibilities of Owner and Charterer to Third Parties—Consequences Under Time and Voyage Charters," 49 Tul. L. Rev. 995, 1015 (1975)("Where the charterer does its own stevedoring, there is an implied *Ryan* warranty of workmanlike service arising by reason of the stevedoring operation.").

To the extent that Manke Tug could somehow be found liable to Schnitzer for damage to its cargo, General Metals' breach of its warranty of workmanlike performance in knowingly overloading the SEA SPRAY and causing it to capsize precludes recovery by General Metals or Schnitzer.

### 4. Defendants Cannot Prove Unseaworthiness

Defendants contend that there was 12 tons of "slack" water in the void tanks of the barge, and contributed to the SEA SPRAY capsizing. There is simply no evidence that any such water existed in the barge prior to capsize. It was only found after the barge capsized, therefore it was just as likely, if not more likely, that the water entered the hull as a result of capsizing than being present before capsizing. Even if it did exist beforehand, however, it could not have contributed to the capsize, as its weight is less than 1/40th of the 519 tons of steel that General Metals knowingly overloaded. Any negligible amount of slack water in the void tanks therefore had no effect.

General Metals' related argument, that there was ballast water in the barge's ballast tanks, also fails. If it was in the ballast tanks, the ballast waster would have been present throughout the eight bareboat charters between August 2006 and March 2007 when the barge's light displacement weight was essentially unchanged. The existence of any such ballast water actually would have *enhanced* the barge's stability, as it would have lowered the barge's center of gravity and would have helped keep the barge upright.

*Shaver*, *supra*, is particularly instructive. In that case, a bareboat charterer entered into an oral agreement with the owner to hire his barge for $50 a day. The bareboat charterer conceded negligence in loading the barge, which capsized, but contended that pre-existing unseaworthiness of the barge was a contributing cause of the accident. *Shaver*, 287 F. Supp.

PLAINTIFFS' TRIAL BRIEF - 13
NO. C07-5494 RBL

ATTORNEYS AT LAW
BAUER MOYNIHAN & JOHNSON LLP
2101 FOURTH AVENUE - SUITE 2400
SEATTLE, WASHINGTON 98121-2320
(206) 443-3400

at 340. The court found that an oral demise charter existed, and then went on to state:

> Matson and the stevedore urge that the fore and aft compartments of the barge contained an excessive amount of water which affected the stability of the vessel and contributed to the disaster …
>
> … It is small wonder that the vessel capsized while carrying on her deck thirty-one vans with a gross weight of 710 short tons, when the weight limit, of which Matson and the stevedore were clearly advised, was 640 short tons.
>
> ….
> To me, as the trier of the facts, it seems incredible that the longshoremen would casually commence loading the barge with a known unstable cargo, if they had observed an obvious list. The evidence, and the inferences therefrom, support a finding that the vans were first loaded on the stern and that it was the method of loading, rather than excess water in a rake, which caused her aft to list to the port side, thus creating an instability and an unseaworthy condition…
>
> The amount of water found in the barge, by Matson's own marine surveyor, would not affect the stability of the barge and this is admitted by Matson's own proctor.

*Id.* at 340-41. *Shaver* is very similar to the case at bench, and refutes the defendants' contentions nearly point-by-point. Under the *Shaver* standard, the SEA SPRAY was clearly seaworthy and General Metals' negligence was the sole cause of the capsize.

### 5. General Metals Waived the Warranty of Seaworthiness

Even if the Court were to find that any of the SEA SPRAY's conditions constituted unseaworthiness, the warranty was waived by General Metals, as "an owner should not be punished for conditions of unseaworthiness knowingly accepted by the charterer or arising when the owner is not in control and possession of the vessel." *Tidewater* 2006 A.M.C. at 553-54 (citing *Dant & Russell, Inc. v. Dillingham Tug & Barge Corp.*, 877 F.2d 1404 (9th Cir. 1989)).

In *Dant & Russell*, the Ninth Circuit stated the rule of waiver of the warranty of seaworthiness as follows:

PLAINTIFFS' TRIAL BRIEF - 14
NO. C07-5494 RBL

ATTORNEYS AT LAW
BAUER MOYNIHAN & JOHNSON LLP
2101 FOURTH AVENUE - SUITE 2400
SEATTLE, WASHINGTON 98121-2320
(206) 443-3400

> The district court also found that Pacific had violated the warranty of seaworthiness. Pacific, however, claims waiver and points out that the warranty of seaworthiness is waived "where full inspection was made by those seeking to charter the vessels ... and the alleged defects or weaknesses were either patent or were especially called to such charterers' attention by the vessel owners."
>
> Here, Hvide, the demise charterer, had full knowledge of the vessel's unseaworthiness and assumed all risks. In similar cases, owners have been absolved of liability. *See id.*; *Nat G. Harrison Overseas Corp. v. American Tug Titan*, 516 F.2d 89, 96 (5th Cir.) (owner is not responsible for conditions which demise charter could have ascertained by reasonable inspection), *modified on other grounds*, 520 F.2d 1104 (5th Cir. 1975). Hvide's conduct constitutes waiver of any warranty claims against Pacific.

*Id.* at 1407 (internal citations omitted).

Thus, regardless of any alleged unseaworthiness of the SEA SPRAY, General Metals has waived any claim that Manke Tug breached the warranty of seaworthiness. It had full knowledge of the limitations of the barge, and it set the safe load limit of 3,500 tons after the "scary roll" in September 2006. Thereafter General Metals repeatedly accepted the barge in that exact same condition for the next six months, without notifying Manke Tug of any problem or limitation. It was well aware of the load limit of the barge when it knowingly overloaded it with 4,019 tons of steel on March 22, 2007. Any unseaworthiness was waived.

### 6. Defendants' Other Contentions are Invalid

Defendants contend there was no bareboat charter in this case because Manke Tug was the SEA SPRAY's primary user, McCullough told Joe Manke he was going to close the fence openings prior to the capsizing, Manke Tug maintained hull insurance on the barge, and a stability book was never provided. None of these contentions have any merit.

Temporary control of a barge does not nullify the existence of a bareboat charter. *The Independent*, 122 F.2d 141, 143 (5th Cir. 1941); *Stoufflet, supra* (bareboat charter existed despite short repossession of the barge by the owner). Nor do restrictions imposed by the owner. *Tidewater, supra* (prohibitions on carrying certain cargoes and in certain areas did not change bareboat charter). The "critical issue" is control over the vessel during the period of

PLAINTIFFS' TRIAL BRIEF - 15
NO. C07-5494 RBL

ATTORNEYS AT LAW
BAUER MOYNIHAN & JOHNSON LLP
2101 FOURTH AVENUE - SUITE 2400
SEATTLE, WASHINGTON 98121-2320
(206) 443-3400

the charter. *Franicevich*, 732 So. 2d at 96; *Willamette-Western Corp.*, 466 F.2d at 1391.

Maintaining hull insurance also does not defeat the existence of a bareboat charter, as it is fully consistent with the owner protecting its interests, precisely for the reason that occurred here. *See Kerr-McGee Corp. v. Law*, 479 F.2d 61, 63 (4th Cir. 1973)(owner of bareboat chartered vessel typically carries hull insurance); *Baker v. Hasbrouck*, 1992 A.M.C. 1303, 1306 (D. Or. 1991)(payment of the vessel repairs, maintenance, and hull insurance simply demonstrates the owners are protecting their ownership interest in the vessel, not maintaining control); *Brophy v. Lavigne*, 801 F.2d 521, 523-24 (1st Cir. 1986)(it is in owner's best interest to ensure that the hull of demise chartered vessel is adequately insured).

Likewise, simply because some aspects of a traditional bareboat charter were not undertaken by General Metals does not undermine the fact that it bareboat chartered the SEA SPRAY:

> It is true, as both W-W [barge owner Willamette-Western Corp.] and the District Court have noted, that C-P did not assume the broad range of responsibilities normally undertaken by a demise charterer. *See e.g., In re Marine Sulphur Transport Corp.*, 312 F. Supp. 1081 (S.D.N.Y. 1970). That, however, is not controlling. Since the nature of a vessel must shape the critical terms of its charter, many of the obligations usually incurred in chartering a vessel cannot, logically, be said to constitute essential parts of crane barge charters.

*Willamette-Western Corp., supra.* The same is true here.

Finally, there is no legal requirement that an owner provide a bareboat charterer with a stability book. The SEA SPRAY was not required to have a load line because of the protective waters where it operated, nor did it have a regulatory load limit because it was uninspected. General Metals never asked for stability book; it only asked for and received a displacement table, the same as for every other barge that it chartered. Moreover, it already knew the barge's safe load limit after it took the scary roll.

The naval architect experts are in basic agreement in this case: the predominant cause of the capsize was that the barge was overloaded. General Metals' and Schnitzer Steel's counterclaims for nearly $400,000, for the cost of dredging the spilled steel, reprocessing it,

PLAINTIFFS' TRIAL BRIEF - 16
NO. C07-5494 RBL

ATTORNEYS AT LAW
BAUER MOYNIHAN & JOHNSON LLP
2101 FOURTH AVENUE - SUITE 2400
SEATTLE, WASHINGTON 98121-2320
(206) 443-3400

and other costs, has no merit whatsoever. The Court should dismiss those claims.

Under maritime law, prejudgment interest is automatic, and the local rate is used for fair and just compensation of losses when equitable. *Todd Shipyards Corp. v. Auto Transp. S.A.*, 763 F.2d 745, 753 (5th Cir. 1985). It is equitable to apply the local rate, 12%. General Metals has clear liability, and its refusal to pay after knowingly overloading and capsizing the barge, and filing its counterclaim to intimidate Manke Tug, a company 1/1,000th its size, renders it equitable to award prejudgment interest at 12%.

## DAMAGES

Plaintiffs' total claim is as follows:

| | |
|---|---|
| Salvage contract | $ 185,000.00 |
| Barge repairs | $ 69,108.96 |
| Loss of charter hire | $ 36,000.00 |
| Surveyor fees | $ 13,854.87 |
| Subtotal | $ 303,963.83 |
| Prejudgment interest | $ 46,622.78 |
| **Total** | **$ 350,586.61** |

## CONCLUSION

The Ninth Circuit in *Western Transportation Co. v. Pac-Mar Service, Inc.*, 547 F.2d 97, 100 (9th Cir. 1976), probably best sums up Manke Tug's circumstances and claim:

> If anything, the Court's language in *Wyandotte* [*Co. v. United States*, 389 U.S. 191, 204-09 (1967)] about refusing to let "a wrongdoer [shift] responsibility for the consequences of his negligence onto his victim" supports Western's recovery.

This precisely applies to this case.

DATED this 13th day of November, 2008.

BAUER MOYNIHAN & JOHNSON LLP

/s/ Matthew C. Crane
_____
Matthew C. Crane; WSBA No. 18003
Attorney for Plaintiffs Manke, Inc., and
American Home Assurance Company

PLAINTIFFS' TRIAL BRIEF - 17
NO. C07-5494 RBL

ATTORNEYS AT LAW
BAUER MOYNIHAN & JOHNSON LLP
2101 FOURTH AVENUE - SUITE 2400
SEATTLE, WASHINGTON 98121-2320
(206) 443-3400

| | |
|---|---|
| 1 | I declare under penalty of perjury of the laws of the state of Washington that on  11/13  , 2008, I electronically filed the foregoing document |
| 2 | with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: |
| 3 | |
| 4 | Christopher W. Nicoll<br>Larry E. Altenbrun<br>Nicoll Black & Feig PLLC |
| 5 | 816 Second Avenue, Suite 300<br>Seattle, WA 98104 |
| 6 | Tel: 206-838-7555<br>Fax: 206-838-7515 |
| 7 | cnicoll@nicollblack.com<br>laltenbrun@nicollblack.com |
| 8 | |
| 9 | BAUER MOYNIHAN & JOHNSON LLP |
| 10 | /s/ Justin Fodness<br>_____ |
| 11 | Justin Fodness<br>jkfodness@bmjlaw.com |

PLAINTIFFS' TRIAL BRIEF - 18
NO. C07-5494 RBL

ATTORNEYS AT LAW
BAUER MOYNIHAN & JOHNSON LLP
2101 FOURTH AVENUE - SUITE 2400
SEATTLE, WASHINGTON 98121-2320
(206) 443-3400